**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                                :
LINDA M. TROJECKI,                              :          CIVIL ACTION
                          Plaintiff,            :
                                                :
              v.                                :          NO. 11-5379
                                                :
THE UNITED STATES OF AMERICA,                   :
                          Defendant.            :
_____         :

Henry S. Perkin, M.J.                                              March 21, 2014

**<u>MEMORANDUM</u>**

   Plaintiff, Linda M. Trojecki ("Mrs. Trojecki"), filed this lawsuit pursuant to the

Federal Tort Claims Act, 28 U.S.C. § 2674, to recover damages for injuries she suffered on

December 21, 2009 as a result of a fall at the United States Post Office located in Downingtown,

Pennsylvania.  On that date, Mrs. Trojecki fell on the smooth metal grating which comprises the

vestibule floor between the outside door of the post office and its interior door.  Mrs. Trojecki

contends that she suffered serious and permanent injuries as a result of the fall.  Michael

Trojecki, Plaintiff's husband, voluntarily withdrew his sole claim for loss of consortium and is no

longer a party in this case.  <u>See</u> Docket Nos. 28, 39.  The case was tried before the undersigned

without a jury on June 10, 2013.  Pursuant to Federal Rule of Civil Procedure 52, and after

hearing all of the evidence in the case and determining the credibility of all witnesses, and

following a separate site view of the subject premises, this Court enters its findings of fact and

conclusions of law.[1]

_____

[1]  This case was originally assigned to the Honorable James Knoll Gardner, and the parties consented to the exercise of jurisdiction by a Magistrate Judge on February 6, 2012.  Judge Gardner entered a February 10, 2012 Order pursuant to 28 U.S.C. section 636 (c) and Federal Rule of Civil Procedure 73 referring this case to the undersigned for resolution.

I.      **FINDINGS OF FACT.**

A.      **The Incident.**

On Monday, December 21, 2009, there was approximately two feet of snow on the ground in the area of the Downingtown, Pennsylvania post office located at 470 Boot Road ("Downingtown Post Office"), left over from a December 19, 2009 major snowstorm.  On December 21, 2009, Mrs. Trojecki went to the Downingtown Post Office to buy stamps for Christmas cards.  (N.T., 6/10/13, p. 21.)  In addition to other winter garb, she wore rubber soled shoes.  According to the National Climatic Data Center's Philadelphia weather report for that date,[2] the temperatures straddled the freezing point, ranging between twenty-two to thirty-eight degrees.[3]   At approximately 2:30 p.m., Mrs. Trojecki parked her automobile in the parking lot and proceeded up the main walkway to the front entrance.  (Id. at 22.)  She opened the door leading into a small vestibule, went through the vestibule to the next set of doors and through those doors into the post office lobby.  From there, she went to a stamp vending machine and made her postage purchase.[4]

After successfully completing this purchase, Mrs. Trojecki turned around and walked out through the inside doors which led to the vestibule and fell on her right side inside the vestibule.  Another customer came over to help her to her feet, and Mrs. Trojecki mentioned to this customer that the floor was wet.  After standing, Mrs. Trojecki went back through the inside doors into the post office and told the male postal clerk behind the counter that she fell and there

---

[2]      Downingtown, Pennsylvania is located approximately 35 miles west of Philadelphia.

[3]      This information was taken from Plaintiff's Exhibit 5 which was admitted without objection.

[4]      At the request of the parties, the Court viewed the Downingtown Post Office premises on June 11, 2013, the day following the one-day trial.

should be mats on the floor because it was wet.  The postal clerk then went to locate the office's

Postmaster, Patricia L. Whalen ("Postmaster Whalen"), to inform her of Plaintiff's fall.  (Id. at

24.)

Postmaster Whalen asked Mrs. Trojecki to sit in a chair and Mrs. Trojecki then

told Postmaster Whalen what had occurred and that there should have been a mat on the floor.

Postmaster Whalen then directed someone, "[g]o put a mat on the floor before someone else

falls."  (Id. at 25.)  She then asked about the Plaintiff's injuries.  Mrs. Trojecki removed her coat

and found that her elbow was bleeding and her hand was scraped.  Her coat and pants were wet

and dirty, whereas they had been dry and clean before she entered the post office.[5]  (Id. at 26.)

Postmaster Whalen asked Mrs. Trojecki if she was all right and if she would give

her permission to take photographs of her person.  Mrs. Trojecki consented and replied that she

was all right, but wanted to leave the premises by another exit, not through the main door at

which she had fallen.  She was embarrassed that she had fallen and did not "want to go back in

front of all those people."  (Id.)  After Postmaster Whalen took photographs of Mrs. Trojecki, she

left through an employee entrance which had a blue floor mat positioned inside the door.  (Id. at

27.)  Mrs. Trojecki then got into her car and drove back to work.  She did not see a warning cone

at the front entrance of the post office either at the time that she entered or at the time that she

left.  (Id. at 24.)

Photographs of the scene taken by Postmaster Whalen after Mrs. Trojecki's fall

show a sidewalk leading to the front entrance of the post office generally clear of snow and ice

---

[5]        Defendant's Exhibit D2-08 is a color copy of a photographs of Mrs. Trojecki's pants depict a dark stain on her right lower pant leg extending from her knee to her ankle.  See D2-08, Bates No. USAO-0022.

3

with some small darker patches in front of and to the side of the entrance.  (Id. at 28.)  Postmaster

Whalen's December 21, 2009 photographs of the vestibule floor show a metal grate with narrow

slats alternated by narrow spaces between the metal slats.  The vestibule floor appears smooth in

character, which was consistent with the Court's view of the premises on June 11, 2013.  (Id. at

29-30.)

At the request of Postmaster Whalen, Mrs. Trojecki provided a written statement

later on the day she fell.  (Id. at 31.)  The statement relates the circumstances of her fall and

discusses her injuries, including details that her skin was broken on her right elbow and her right

hand was bruised with a small blood blister.  She also reported that both of her wrists, her hip

and knees were sore and that her whole body felt a little "banged up."  (Id. at 32.)  Most of Mrs.

Trojecki's pain was on the right side of her body including her arm, hip and shoulder.[6]

## B.      Liability.

Mrs. Trojecki fell in the vestibule of the Downingtown Post Office building,

which is an area between the outside and inside doors leading to the post office lobby.[7]  The

Defendant presented evidence that the vestibule floor consists of metal horizontal grating which

Defendant's expert says is designed to prevent the collection of water on the vestibule floor.  (Id.

at 122.)  All customers entering or leaving the Downingtown Post Office must cross through the

vestibule.  (Id. at 124.)

Over the weekend of December 19 and 20, 2009, the Downingtown area sustained

---

[6]      The written statement provided to Postmaster Whalen did not specifically mention Mrs. Trojecki's
shoulder.  At trial, Mrs. Trojecki explained that when she said she felt like she was "banged up," the general
description included injury to her hip, arm and shoulder.  (N.T., 6/10/13, p. 33.)

[7]      This area was observed by the Court at its site view on June 11, 2013.  At the site view, the Court
noted that there are no handrails or railings on the inside of the vestibule.

a heavy snowstorm with between eighteen (18) and twenty-one (21) inches of snow.  On the morning of December 21, 2009, snow was plowed from the Downingtown Post Office parking lot before the post office opened for business.  (Id. at 79.)  Snow was also shoveled from the sidewalks and ice melt was placed on the pavement surfaces.  In addition, the custodian on duty mopped and vacuumed the post office lobby at various times throughout the day until approximately 12:30 p.m., when her shift ended.  (Id. at 137-147.)  A yellow sign which indicated a possible wet floor and carpet runners were placed in the lobby area inside the post office on December 21, 2009.  (Id. at 147.)  The defendant, however, admits that the vestibule floor consisted of a bare metal grate and no carpets were placed within the vestibule between the outside and inside lobby doors on December 21, 2009 prior to Mrs. Trojecki's fall.

Mrs. Trojecki presented the testimony of John Steven Posusney, P.E., a licensed civil structural engineer.  (Id. at 153.)  The Court found that Mr. Posusney's testimony met the requirements of Federal Rule of Evidence 702[8] and that his testimony was credible.  Mr. Posusney noted that the walking surface of the vestibule was a smooth metal surface.  He opined that once such a surface is contaminated by introducing snow or water from a person's footwear, such a condition will severely diminish attraction or slip resistance.  (Id. at 158-159.)  In reaching

---

[8]      Federal Rule of Evidence 702 provides:

A witness who is qualified as a n expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)      the expert scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or to determine a fact in issue;
(b)      the testimony is based on sufficient facts or data;
(c)      the testimony is the product of reliable principles and methods; and
(d)      the expert has reliably applied the principles and methods to the facts of the case.

F.R.E. 702.

his conclusion, Mr. Posusney noted that the grate surface in the vestibule of the Downingtown Post Office was relatively smooth with no serrations or abraded treatment to render the surface slip resistant under wet conditions.  (Id. at 162.)  Mr. Posusney concluded that the vestibule surface would be hazardous and dangerous to walk on when wet because of its smooth, hard surface without any abrasions or serrations.  (Id. at 165.)  To further illustrate his conclusion, Mr. Posusney noted that June 10, 2013, the day he appeared to offer his trial testimony, was a rainy day.  Mr. Posusney also noted that the vestibule in the United States Courthouse and Federal Building in Allentown, Pennsylvania is very similar to the vestibule in the Downingtown Post Office.  He noted, however, that the Courthouse vestibule has "an inlaid floor mat which had a carpet-like or pile such that it essentially would remove wetness from a person's footwear and render that surface -- or render the surface in entering the building to be slip resistant under rainy or wet conditions . . . ."  (Id. at 167.)  Mr. Posusney noted that the Downingtown Post Office floor was designed as an open grate surface with slits so that water could drain from the surface. (Id. at 170.)  Nevertheless, he concluded that the "non-air voided" metal surface was smooth and hard.  (Id.)  Since it was "devoid of any abrasions, any serrations," when it was wet, it would create a condition with "severely diminish[ed] . . . traction. . . ."  (Id. at 170.)  Mr. Posusney further opined that under wet conditions, it would be reasonable to provide a mat over such surfaces with severely diminished traction as the vestibule in the Downingtown Post Office.  (Id. at 174.)  He further noted that the placement of a warning sign is the least effective method of protecting the public since it does not actually remove the dangerous condition.  (Id. at 173-174, 205-206.)  Based upon these opinions and his personal observations, Mr. Posusney concluded that the condition of the vestibule in the Downingtown Post Office was foreseeably hazardous or

dangerous, and that the walking surface was inherently dangerous when wet.  (Id. at 177.)  He further indicated that, although there appeared to be no evidence of prior reported falls for thirteen (13) years[9] prior to Mrs. Trojecki's fall on December 21, 2009, it was his opinion that the danger remained clear because the slatted floor did not meet the qualitative standards for a slip resistant walking surface when wet.  (Id. at 189.)  He noted that the metal grating in the floor was to avoid surface flow of water by having a drain into the particular grate, but that, in fact, did not stop the smooth surface from being dangerous when it was not dry.  (Id. at 204.)

The Defendant presented the testimony of Robert J. Cohen, P.E., a licensed civil engineer, as an expert with regard to professional engineering and walking surface safety.  (Id. at 223-224.)  The Court found that Mr. Posusney's testimony met the requirements of Federal Rule of Evidence 702.  Mr. Cohen was called as a witness for the purpose of offering his opinion concerning the safety of the grating.  (Id. at 225.)  He explained that the slip resistance of a surface is the walking coefficient of friction.  (Id.)  Slip resistance can be measured.  (Id.)  In 1940, Sidney James of Underwriters Laboratories, developed the James Machine for the purpose of testing a floor tile to determine whether it had a 0.5 coefficient of friction and if it did, "people didn't slip and fall."  (Id. at 226-227.)  The 0.5 coefficient of friction became the standard measure of slip resistance.  (Id. at 227.)  Later refinement of this analysis in the 1970s when "force plate analysis" began, measured actual slip resistance and found that slipping commenced during walking at a coefficient of friction of 0.35 and below, which was also known as a hazard

---

[9]       Postmaster Whalen testified that no other people besides Mrs. Trojecki fell on the metal grating in the vestibule during her thirteen (13) year tenure at the the Downingtown post office.  (N.T., 6/10/13, p. 127.) Lorenzo Allen testified that he had seen no falls in the vestibule during his seven (7) years of working at the Downingtown post office as a sales and service associate working at the window assisting customers.  (Id. at 146-48.)

level.  (Id. at 227.)  The factor of safety was up to 0.5, which was a maintenance level.  (Id.)
It was Mr. Cohen's opinion that the metal grating of the vestibule was a "slip-resistant surface for
walking when wet."  (Id. at 228.)  He further opined that the metal grating in the vestibule did not
expose Mrs. Trojecki to a slip hazard and was not a cause of her fall.  (Id.)  He further opined
that a mat was unnecessary to cover the metal grating in the vestibule of the Downingtown Post
Office.  (Id. at 228, 243.)  He did not give an alternate opinion as to what may have caused her
fall.  He stated that the purpose of the grate was to allow "any moisture to drain, any dust or
debris to drop through, so that the walking surface stays clean."  (Id. at 229.)  He indicated that a
thin film of water can accumulate on the top of this metal grating.  (Id.)  He testified that the
metal grate at the Downingtown Post Office is a design which he has seen in many other
buildings.  (Id. at 230.)  In reaching his opinion, he considered the fact that Mrs. Trojecki entered
the post office through the vestibule without any difficulty, as did other patrons on December 21,
2009.  (Id. at 234.)

   Mr. Cohen tested the vestibule surface of the Downingtown Post Office under
both wet and dry conditions using a tribometer, which is intended to replicate shoe sole material
in testing for the coefficient of friction.  (Id. at 234-236.)  He found the friction coefficient to be
0.5 or greater, thereby concluding that the grating was a slip resistant surface for walking,
whether it was dry or wet. (Id. at 234-236.)  Mr. Cohen disagreed with the conclusions of Mr.
Posusney.  Mr. Cohen opined that a grip strut, which is an "up-set metal grating" is a metal
grating with very sharp projections, and was not an appropriate application for the Downingtown
Post Office vestibule because although grip strut has some industrial applications and is good for
persons wearing work boots, the surface could catch certain heels, could tear skin or cause a

person to require stitches from a fall onto it.  (Id. at 242.)  Mr. Cohen also disagreed with Mr.

Posusney's opinion that adhesives on the metal grating were necessary.  (Id.)  In essence, Mr.

Cohen opined that no further modification of the grated vestibule floor in the Downingtown Post

Office was necessary because it was a slip resistant surface in the condition it was in, and based

upon his tests, there was no other surfacing materials required.  (Id. at 242.)  Mr. Cohen admitted

that the grading was wet at the time the plaintiff fell, but repeatedly stated that the grating was

safe because it was slip resistant, in accordance with his testing.  (Id. at 242-243, 256-258.)

Patricia L. Whalen was the Postmaster of the Downingtown Post Office on

December 21, 2009, a position she has held since 1997.  (Id. at 99.)  Normally, two custodians

are assigned to the facility.  (Id. at 103.)  On December 21, 2009, neither custodian was present

on the premises at the time of Mrs. Trojecki's fall at approximately 2:30 p.m.  (Id. at 103-104,

135.)  One custodian was on vacation that day.  (Id. at 103.)  Carol Kay, the other custodian,

worked on December 21, 2009 until about 12:00 or 12:30 p.m.  (Id. at 104, 135)  When  Mrs.

Trojecki fell, Postmaster Whalen prepared and filled out an accident report, as she was required

to do within twenty-four hours following the accident.  (Id. at 104, 105; Pl.'s Ex. P-2.)[10]

Although the accident report form provided blocks for information related to surface, surface

conditions, circumstances leading to the injury or damages, item causing the actual injury or

damages, hazardous situation or defective or hazardous equipment, these blocks were not filled

out by Postmaster Whalen.  (N.T., 6/10/13, pp. 107-108.)  Nevertheless, she provided answers in

her testimony at trial.

Postmaster Whalen indicated that it would have been appropriate for her to note

---

[10]     This exhibit was admitted into evidence with no objection by the Defendant.

that the surface condition of the vestibule was wet. (Id. at 109.)  She noted in the narrative

portion of the report that "[t]he accident occurred on the Monday following a 23-inch snowfall

from the weekend.  The customer traffic was very heavy due to the upcoming holiday.  The

melting snow and ice was being tracked in."  (Id. at 108.)  With regard to the block which dealt

with circumstances leading to injury or damage, Postmaster Whalen testified that she would have

coded that portion of the report with "falls on same level, floors."  (Id. at 109-110.)  The report

also asked for information concerning whether there was a hazardous situation directly related to

the accident.  While Postmaster Whalen did not fill in that block on the accident report, she

indicated at trial that, based upon the information provided by Mrs. Trojecki on December 21,

2009, she would have noted that it was a "slippery or uneven surface" at the time she completed

the accident report.[11]  (Id. at 111.)  Postmaster Whalen noted that Mrs. Trojecki told her that the

floor was slippery and no other witnesses present at the time contradicted or rebutted that

information.  (Id. at 112.)  She further testified that there were no unsafe personal factors

regarding Mrs. Trojecki at the time of her fall. (Id. at 113.)  In a narrative portion of her report,

Postmaster Whalen wrote:

> On Monday, December 21, 2009, at approximately 2:35 P.M., Mrs. Linda M. Trojecki, a
> postal customer, slipped in the lobby vestibule area while attempting to exit the lobby.
> Mrs. Trojecki states that the metal grate on the floor in the vestibule was wet and when
> she turned slightly to the right, her feet slipped out and she fell to the floor (grate), with
> most of the impact to her right side and knees.  She said that another customer assisted
> her to get up.
>
> Mr. Trojecki injured her right hand, right wrist, right elbow, right hip and both knees.

---

[11]        Exhibit P-2 , which was presented to Postmaster Whalen at the time of her testimony, contained a
coding key, which would have allowed her to place a corresponding code number in each block.  The coding key
was in front of Postmaster Whalen at the time of her trial testimony, and she used the key to provide answers to the
questions related to the blocks of the report which she previously left blank.

The skin on her elbow split open slightly and there was a small spot of blood about the size of a dime.  She refused medical attention, but said that she may go to the doctor if her elbow gets any worse.  She did ask to apply a band-aid to her elbow while in the office.

Mrs. Trojecki was wearing flat shoes, with rubber soles.  The soles had no tread.  Pictures were taken of her shoes, her injuries, and her pants that were soiled at the knees from the fall.  Mrs. Trojecki was anxious to return to work and said that she would fax me a statement to include in the file.  She said that she was more embarrassed than anything else and asked if she could exit from our side door as opposed to going back out into the lobby.

There were "wet floor" signs posted in the lobby.  The lobby traffic was very heavy with holiday mailing 12/21 and due to the 23" snow storm that we had the previous Saturday.

See Pl.'s Ex. 2, p. 2..

Postmaster Whalen testified that there are approximately seven cameras in the lobby area of the Downingtown Post Office which can record from various angles of the lobby. (N.T., 6/10/13, p.116.)  She testified that the data on these cameras is overwritten approximately every thirty days.  (Id. at 117.)  Neither Postmaster Whalen nor anyone at the post office sought to preserve the video files from the cameras for December 21, 2009.  (Id.)  Those video files were not preserved, and were taped over.  (Id.)

Postmaster Whalen testified that Mrs. Trojecki requested to leave the building by the employee-only door.  (Id. at 118-119.)  That door had a rug placed before it so that employees could dry off their feet before stepping onto the linoleum floor which covered the employee-only area of the post office.  (Id. at 120.)  In addition, Postmaster Whalen identified the statement in block 40 of the incident report as stating, "the melting snow and ice was being tracked in."[12] (Id.)  Postmaster Whalen further testified that in the 2012 calendar year, eighty-seven thousand (87,000) customers entered and exited the Downingtown Post Office through the vestibule.  (Id.

---

[12]     This statement is in block 40 of Plaintiff's Exhibit P-2 bearing Bates number USAO 0005.

11

at 124.)  She was unaware of any individuals other than Mrs. Trojecki falling in the vestibule

area during 2012.  (Id. at 124, 127.)  She personally did not check the metal grating of the

vestibule area after she learned of Mrs. Trojecki's fall.  (Id. at 129.)  Finally, Postmaster Whalen

testified that following her fall, Mrs. Trojecki seemed very angry and anxious and wanted to get

back to work.  (Id.)

   Carol Kay testified that she was the custodian on the premises on December 21,

2009, until approximately 12 to 12:30 p.m.  (Id. at 134-135.)  Ms. Kay testified that when she

arrived for her shift at around 7:00 to 7:30 a.m., Mr. Meyer, the other custodian, had already

placed ice melt on the sidewalk outside the vestibule.[13]  (Id. at 137, 139.)  She identified the ice

melt substance in photographs of the sidewalk area outside the vestibule which were taken

following Mrs. Trojecki's fall.  (Id. at  139.)

   Lorenzo Alston, Jr., was a sales and service associate at the Downingtown Post

Office on December 21, 2009, and was working behind the customer service window at the time

Mrs. Trojecki fell.  (Id. at 146-47.)  He testified that before Mrs. Trojecki's fall, a yellow safety

cone which bore cautionary writing that the floor may be wet and slippery had been placed in the

lobby near the public entrance and exit doors.  (N.T., 6/10/13, p. 147.)  In addition, carpet

runners had also been placed inside the lobby for postal patrons to wipe their feet when they

entered the lobby from the vestibule through the inside doors.  (Id.)

---

[13]  Ms. Kay testified that although Mr. Meyer was on vacation on Monday, December 21, 2009.
Because Monday was Ms. Kay's usual day off, she suspected that Mr. Meyer thought that she was not working that
day, so Mr. Meyer went to the Downingtown Post Office and cleared the sidewalks before she arrived for her shift at
7:00 to 7:30 a.m.  (N.T., 6/10/13, p. 137.)

### C.      Plaintiff's Physical Condition.

In 1992 or 1993, Mrs. Trojecki was involved in an automobile accident.  She claims that she suffered no permanent injury to her shoulder and had no limitations as a result of that accident.  Prior to Mrs. Trojecki's fall, she experienced right shoulder pain, having first advised her healthcare providers of this pain on September 16, 2008.  Nancy J. Walker, M.D., a rheumatologist with the Arthritis & Osteoporosis Center, Inc., diagnosed Mrs. Trojecki's condition as likely bursitis in her right shoulder.  Dr Walker prescribed some medication for Mrs. Trojecki and recommended a course of water therapy and possibly physical therapy with a possible follow-up of a cortisone shot.  (N.T., 6/10/13, pp. 38-39.)  On December 4, 2009, Mrs. Trojecki saw her primary care physician, Alan P. Levine, M.D., concerning the pain in her shoulders.  Dr. Levine referred her to Leonard L. D'Addesi, M.D., an orthopedist with Keystone Orthopaedic Specialists, who administered a cortisone shot and diagnosed Mrs. Trojecki's shoulder pain as due to tendinitis.  (Id. at 40.)  Dr. D'Addesi also prescribed physical therapy. (Id.)  Notwithstanding this shoulder issue, Plaintiff testified that she had no physical limitations prior to her subject fall except some difficulty sleeping due to pain which began approximately two months prior to her fall.  Despite her pain, she continued to work and exercise.  (Id. at 40-41.)  There was no evidence of any traumatic injury prior to Mrs. Trojecki's December 21, 2009 fall at the Downingtown Post Office.

Within a day or two after her fall, the pain worsened in Mrs. Trojecki's right shoulder and she experienced sharp and constant pain.  (Id. at 42.)  As a result, she called Dr. D'Addesi and he ordered a right shoulder MRI.  (Id. at 43.)  When Mrs. Trojecki visited Dr. D'Addesi on January 17, 2010, he advised her that the MRI showed a full thickness tear of her

right shoulder supraspinatus tendon with fluid around the upper portion of the scapularis.[14]  Dr.

D'Addesi diagnosed Mrs. Trojecki with right shoulder impingement bursitis with a rotator cuff

tear of her right shoulder and he recommended surgery.  (Id. at 43-44.)  She continued with three

physical therapy sessions and had surgery on February 23, 2010, which repaired the right rotator

cuff and biceps tendon.  (Id. at 44.)   From the time of her fall to the time of her surgery, Mrs.

Trojecki experienced constant burning and sharp pain in her right shoulder.  (Id. at 43-44.)

Following the surgery, her right arm was immobilized in a sling for about six weeks and she took

various pain medications, including Percocet, Oxycontin, Darvocet and Tylenol with codeine, all

of which upset her stomach and were difficult to tolerate.  (Id. at 45-46.)  After this surgery, Mrs.

Trojecki remained out of work on short term disability for approximately one month until April,

2010.  (Id. at 46-47.)  When she returned to work in April 2010, she continued to experience

constant pain and underwent physical therapy for several weeks, but received no relief from the

pain.  (Id. at 44-46.)

On June 22, 2010, Mrs. Trojecki underwent a second surgery by Dr. D'Addesi to

manipulate her right shoulder under general anesthesia. (Id. at 46-47.)  The recovery from this

procedure caused her to be out of work for approximately a month on short term disability and

she was required to undergo another course of physical therapy.  (Id. at 47.)  Mrs. Trojecki

testified at trial that the pain continued and remains constant to the present time.

Mrs. Trojecki continued to have constant right shoulder pain, and consulted with

Gerald R. Williams, Jr., M.D., an orthopedic surgeon with The Rothman Institute at Jefferson, on

November 24, 2010.  (Id. at 48-50.)  Dr. Williams made two suggestions.  The first was to

---

[14]         Plaintiff's Exhibit 11was admitted into evidence without objection from the defendant.

continue a course of physical therapy and home exercise.  The second was an additional

arthroscopic rotator cuff surgery.  (Id. at 55-56.)  Mrs. Trojecki decided not to undergo the

additional surgery recommended by Dr. Williams because she was afraid that her symptoms

would not be alleviated.  (Id. at 56.)  As a result, she underwent physical therapy for months and

also tried acupuncture and massage therapy, none of which alleviated her right shoulder pain.  (Id.

at 55-57, 59-60.)  Approximately one year later, Mrs. Trojecki agreed to the surgical procedure.

(Williams Dep., pp. 27-28.)  On June 4, 2012, Mrs. Trojecki underwent arthroscopic

debridement surgery by Dr. Williams and she again missed work under short term disability for

approximately four to six weeks following that surgery.  (N.T., 6/10/13, pp.57-58.)  The result of

the surgery was improvement of her right shoulder range of motion but no pain relief.  (Id. at 58;

Williams Dep. at 18.)  Mrs. Trojecki last saw Dr. Williams in December, 2012, and he related

that he could not do anything more to help her.  (N.T., 6/10/13, p. 58.)

Both Mrs. Trojecki and her husband testified at trial that she continues to have

limitations with activities due to her continued pain.  She can no longer play with her

grandchildren as she did years ago, she does not exercise at the gym, she cannot perform heavy

gardening work, she must manipulate a grocery cart with her left hand rather than her right, and

she cannot lift items above her shoulder level which causes such difficulty, for example, with

clothes shopping using her right arm.  (Id. at 61-62.)  She has difficulty sleeping and must sleep

with a neck pillow under her right arm, and she performs clerical work at the office with a pillow

under her arm for support.  (Id. at 62.)  She also testified that she has some limitations with

hiking such as limiting her activities to mainly flat, small hills.  (Id.)

D.     **Medical Expert Opinions.**

Each party presented a medical expert.  Mrs. Trojecki presented the deposition testimony and opinions of Gerald R Williams, Jr., M.D., and the defendant presented the deposition testimony and opinions of Stanley R. Askin, M.D.  The Court found that both Dr. Williams and Dr. Askin met the requirements of Federal Rule of Evidence 703 and permitted the admission of their deposition testimony into evidence.

Dr. Williams testified that he reviewed all of Mrs. Trojecki's medical records from prior physicians and other healthcare providers.  He was also aware of Mrs. Trojecki's shoulder problems prior to her December 21, 2009 fall.  He opined that Mrs. Trojecki's December 21, 2009 fall caused acute and permanent exacerbation of her underlying rotator cuff impingement syndrome.  (Williams Dep. at 67.)  Dr. Williams further opined that Mrs. Trojecki's condition is permanent and that she will have pain for the rest of her life.

Stanley R. Askin, M. D., the defense medical expert, opined, based on a review of Mrs. Trojecki's medical records, that her continued pain was not caused by her December 21, 2009 fall, but instead was attributable to a pre-existing chronic condition.  (Askin Dep., pp. 12-32.)  Dr. Askin largely relied on an operative note of Dr. D'Addessi, wherein Dr. D'Addessi states that Mrs. Trojecki's rotator cuff surgery was performed to repair a chronic tear in the rotator cuff.  Dr. Askin further opined that if Mrs. Trojecki's pain was caused by a torn rotator cuff, her pain would have subsided after the surgical repair performed by Dr. D'Addessi in February of 2010.  (Id. at 48-49.)

E.     **Discussion.**

The FTCA provides a remedy in damages for the negligence of employees of the

16

United States.  28 U.S.C. § 2674.  A plaintiff pursuing an FTCA claim must show: (1) that a duty

was owed to him by a defendant; (2) a negligent breach of said duty; and (3) that the negligent

breach was the proximate cause of the plaintiff's injury/loss.  Mahler v. United States, 196

F.Supp. 362, 364 (W.D. Pa.1961), aff'd, 306 F.2d 713 (3d Cir. 1962).  It is well-settled that a

federal district court addressing an FTCA action must apply the law of the state in which the

alleged tortious act or omission occurred, in this case Pennsylvania.  28 U.S.C. § 1346(b) (2013);

Toole v. United States, 588 F.2d 403, 406 (3d Cir. 1978)(citation omitted).  Under Pennsylvania

law, a negligence claim has four elements:

> (1) a duty or obligation recognized by the law, requiring the actor to conform to a
> certain standard of conduct for the protection of others against unreasonable risks;
> (2) a failure to conform to the standard required; (3) a causal connection between
> the conduct and the resulting injury; and (4) actual loss or damage resulting in
> harm to the interests of another.

Felix v. GMS, Zallie Holdings, Inc., 501 F. App'x 131, 134 (3d Cir.  2012) (quoting Nw. Mut.

Life Ins. Co. v. Babayan, 430 F.3d 121, 139 (3d Cir. 2005)).

>        1.      Premises Liability.

        Under Pennsylvania law, a landowner owes business invitees "the highest duty

owed to any entrant upon land."  Campisi v. Acme Markets, Inc., 915 A.2d 117, 119 (Pa. Super.

2006); Flickinger v. Toys R Us, Inc., Civ. A. No. 10–305, 2011 WL 2160493, at *3 (M.D. Pa.

May 31, 2011), aff'd, 492 F. App'x 217 (3d Cir. 2012).  Pennsylvania law imposes liability for

physical harm to business invitees due to dangerous conditions on the property, if the landowner:

(1) knows or reasonably should have known of the dangerous condition; (2) should have

expected that the invitee would not discover or realize the danger; and (3) failed to exercise

reasonable care to protect the invitee against the danger.  See, e .g., Farina v. Miggy's Corp. Five

17

& Six, CIV. A. No. 3:09cv00141, 2010 WL 3024757, at *4 (M.D. Pa. July 29, 2010)(citing

Restatement (Second) of Torts § 343)).  Courts applying this analysis are mindful that store

owners are not insurers of their customers' safety.  Id. at *7 (citing Myers v. Penn Traffic Co.,

606 A.2d 926 (Pa. Super. 1992)).

It is undisputed that Mrs. Trojecki was a business invitee of the Downingtown

post office on December 21, 2009.  To establish that the Defendant breached its duty to her as a

business invitee, Mrs. Trojecki must establish that the Defendant "had either direct [actual] or

constructive notice of the foreign substance on the floor as a potentially dangerous condition."

Felix,  501 F. App'x at 134 (quoting David by Berkeley v. Pueblo Supermarket of St. Thomas,

740 F.2d 230, 233 (3d Cir. 1984) (internal citation omitted)).  "'[T]he issue of *prior* notice to the

store, either actual or constructive, of an unreasonable risk of harm is more difficult to establish

[than establishing the presence of a foreign substance on the floor].'"  Id. at 134-135 (quoting id.

at 234)(emphasis in original)).  If the Defendant had been warned about the condition of the

liquid on the floor beforehand, actual notice exists.  Id. at 135.  "Alternatively, a party may show

constructive notice by 'demonstrating that the floor condition had existed for such a length of

time that the storeowner, in the exercise of ordinary care, should have been aware of the

condition.'"  Id. (quoting David by Berkeley, 740 F.2d at 236).

Courts use several factors to determine whether a defendant store owner had

constructive notice of a hazardous condition including:

> (1) the time elapsing between the creation of the defect and the accident; (2) the
> size and physical condition of the premises; (3) the nature of the business
> conducted there; (4) the probable cause of the condition; and (7) the opportunity
> which a reasonably prudent person would have had to remedy it.

Baynes v. The Home Depot U.S.A., Inc., CIV. A. No.  09-3686, 2011 WL 2313658, at *7 (E.D.

Pa.  June 9, 2011) (citing Henderson v. J.C. Penney Corp., Inc., Civ. A. No. 08–177, 2009 WL

426180, at *4 (E.D. Pa. Feb. 20, 2009) (citing Bremer v. W.W. Smith, Inc., 126 Pa. Super. 408,

191 A. 395, 397 (Pa. Super. 1937))).  In determining whether the Defendant had constructive

notice, "one of the most important factors to be take into consideration is the time elapsing

between the origin of the defect or hazardous condition and the accident."  Neve v. Insalaco's,

771 A.2d 786, 791 (Pa. Super. 2001).  Evidence as to the duration that a hazardous condition

existed prior to an accident is necessary before constructive notice may be inferred.  In other

words, the hazardous condition "must exist for such a length of time that in the exercise of

reasonable care, the owner should have known of it."  Moultrey v. Great A & P Tea Co., 422

A.2d 593, 596 (Pa. Super. 1980).

        Testimony at trial established that custodians customarily mopped the lobby and

vestibule floors early in the morning at approximately 6:30 or 7:00 a.m., and that personnel mop

again if there are rain or snow accumulations.  On December 21, 2009, there is no evidence that

such additional mopping was done.  If a hazard exists for a very short period of time before

causing an injury, then the possessor of the land, "even 'by the exercise of reasonable care,'

would not discover the hazard, and thus would owe no duty to protect invitees from such a

hazard."  Craig v. Franklin Mills Assoc., L.P., 555 F. Supp.2d 547, 550 (E.D. Pa. 2008), aff'd,

350 F. App'x 714 (3d Cir. 2009) (quoting Restatement (Second) of Torts § 343).  Likewise, what

is a "very short" period of time will vary depending on the other circumstances of the dangerous

condition and defendant's actions or inaction.  See David by Berkeley, 740 F.2d 230 (finding that

a jury could reasonably infer that cottage cheese had been on the floor of a supermarket for an

unreasonable amount of time based on testimony that it had been there since "about two hours

ago - an hour and a half ago").

After reviewing all of the evidence in this case, it is the opinion of the Court that

the Defendant's negligence was the factual cause of Plaintiff's fall and resulting injuries.  The

Defendant had a duty to make certain that the surface of the vestibule was not dangerous or

slippery. While both parties presented expert witnesses in the form of civil engineers who

testified at length concerning the condition and design of the grated vestibule floor, both experts

acknowledged that there was wetness or moisture on the vestibule floor at the time that Mrs.

Trojecki fell.  During the trial, the Court heard a great deal of testimony concerning whether or

not there were warning signs or cones as well as mats in the lobby area of the Downingtown Post

Office.  The fact that there were mats on the lobby floor and some type of notice by way of a

safety cone that the lobby floor was wet supports the conclusion that the vestibule itself was wet.

In addition, photographs of Mrs. Trojecki's pants following her fall show a darkened area

extending from her outer right knee to ankle.  Yet, the Defendant did not take steps to assure that

the vestibule was safe.  The testimony indicates that the last time Defendant's custodial staff was

present on the premises was approximately two to two-and-one-half hours before Mrs. Trojecki's

fall.  The Defendant felt it was important to place a mat in the employee entrance and exit as well

as the lobby and testified that it provided warning devices in the form of either a cone or sign, yet

no rugs were placed in the vestibule.[15]

---

[15]        The Court is aware of the fact that the Defendant placed mats in the vestibule after Mrs. Trojecki's fall.  The Court did not consider this fact as evidence of the Defendant's negligence.  Rather, placement of the mats in the vestibule was considered for the limited purpose of determining whether not it was feasible for the Defendant to place a mat in that area.  The Court concludes that it was feasible to do so.

Approximately twenty-three (23) inches of snow fell on December 19, 2009. Although the walkways were cleared and the Defendant provided for chemical ice melt to be placed on the sidewalk area, the Defendant reasonably concluded that water, and possibly ice could be brought into the post office and therefore placed the warning signs as well as the mat near the public entrance of the lobby. Mrs. Trojecki traversed that area and fell on her way back out of the post office in the vestibule where there was no mat. By not placing a mat in the vestibule area or taking other steps to assure that the surface would not be slippery and wet, the Defendant breached its duty of care to Mrs. Trojecki and the Court finds that the Defendant was negligent by a preponderance of the evidence.

2.      Comparative Negligence.

Under Pennsylvania's comparative negligence statute, 42 Pa. Cons.Stat. Ann. § 7102, a plaintiff's negligence bars recovery only when it is greater than that of the defendant. Peraza v. U.S., CIV. A. No. 3:CV-12-1353, 2013 WL 5441985, at *6 (M.D. Pa. Sept. 27, 2013) (citing Bouchard v. CSX Transp. Inc., 196 F. App'x 65 (3d Cir. 2006)). After complete review of the record, the Court can find no evidence showing that Mrs. Trojecki was negligent, or that any possible negligence on her part contributed in any way to her injury. As a result, the Court finds that the defendant was one hundred (100%) percent responsible for Mrs. Trojecki's injuries.

**F.     Damages**

Mrs. Trojecki seeks damages of $43,590.09 in medical expenses, comprised of liens to her health insurer in the amount of $34,062.90 and out-of-pocket expenses of $9,527.19. Dr. Askin's testimony that Mrs. Trojecki's continued pain was attributable only to a pre-existing condition is not persuasive. Dr. Williams credibly testified that Mrs. Trojecki's December 21,

2009 fall caused acute and permanent exacerbation of her underlying rotator cuff impingement syndrome and that her condition is permanent.  Mrs. Trojecki may therefore recover for medical expenses incurred due to all of the injuries that she alleges stem from her fall including her multiple shoulder operations and therapies.

Mrs. Trojecki seeks $15,000.00 for earnings lost during the three time periods while she recuperated from her surgeries.  Despite her continued pain, she has continued to work as an administrative assistant using modalities such as a pillow under her arm for support.  She will be awarded the claimed amount of lost wages.

Mrs. Trojecki also makes a claim for past and future pain and suffering and loss of enjoyment of life's pleasures.  There is no question that Mrs. Trojecki suffered from shoulder pain before her fall.  In fact, it is Mrs. Trojecki's theory that the Defendant's negligence, and her resulting injury on December 21 was an exacerbation of a pre-existing injury.  Notwithstanding the interpretation of by Dr. Askin of Mrs. Trojecki's medical records, the Court has found no evidence of a pre-existing traumatic injury before December 21, 2009.  The Court also finds that Mrs. Trojecki's pain before December 21st was of a lesser magnitude and not as constant as it became after her fall.  She continues to have limitations with activities due to her continued pain. She can no longer play with her grandchildren as she did years ago, she does not exercise at the gym, she cannot perform heavy gardening work, she must manipulate a grocery cart with her left hand rather than her right, and she cannot lift items above her shoulder level with her right arm without difficulty.  (N.T., 6/10/13, pp. 61-62.)  She has difficulty sleeping and must sleep with a neck pillow under her right arm, and she performs clerical work at the office with a pillow under that arm for support.  (Id. at 62.)  She also testified that she has some limitations with hiking such

22

as limiting her activities to mainly flat, small hills.  (Id.)

    The Court will award Mrs. Trojecki an additional $90,000 to compensate her for her pain and suffering and loss of life's enjoyment.  Taking the circumstances of this case into account, the Court concludes that this amount accurately reflects the seriousness of Mrs. Trojecki's injuries and their consequences.  See Baynes, 2011 WL 2313658, at *7 (Schiller, J.)(awarding $19,383.61 compensatory damages for medical expenses and $25,000 damages for pain and suffering where shoulder pain controlled through physical therapy and exercise)(citing contra Nicholson v. Esteves, Civ. A. No. 08–3776, 2010 WL 914931, at *7 (E.D. Pa. Mar. 12, 2010) (Bartle, J.) (awarding compensatory damages of $2,115 for medical expenses and $75,000 for pain and suffering in non-jury civil rights case, award reduced for lack of timely treatment and injuries not caused by arresting officer's actions); and Andrews v. Karras, Civ. A. No. 97–3414, 1998 WL 754724, at *5–6 (E.D. Pa. Oct. 29, 1998) (Yohn, J.) (discussing damages awards for pain and suffering)).

## II. <u>CONCLUSIONS OF FACT AND LAW.</u>

  1.  The Court finds that the Defendant owed a high duty of care to Mrs. Trojecki as a business invitee upon the premises of the Downingtown Post Office on December 21, 2009.

  2. The Court finds that the Defendant breached the aforesaid duty of care as discussed above, and was, therefore, negligent.

  3.  The Court finds that the Defendant's negligence was the factual cause of Mrs. Trojecki's injuries when she fell at the Downingtown Post Office on December 21, 2009.

  4.  The Court finds that Mrs. Trojecki was not negligent when she exited the Downingtown Post Office and fell in the vestibule on December 21, 2009.

5.  The Court finds that Mrs. Trojecki's right shoulder injury as a result of her fall was an aggravation and/or exacerbation of a pre-existing injury and that the aggravation and/or exacerbation is permanent.

**III.**     <u>**VERDICT**</u>**.**

After a non-jury trial held on June 10, 2013, a view of the premises in question on June 11, 2013, and a thorough review of all of the evidence in this case, the Court finds in favor of Mrs. Trojecki and against the Defendant.  The Court will therefore award Mrs. Trojecki $148,590.09 in damages.  A Judgment and Order consistent with this Memorandum will be docketed separately.

BY THE COURT:


 */s/ Henry S. Perkin*
HENRY S. PERKIN, U.S.M.J.